Filed 12/29/14  Paletz v. Adaya CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE


| | |
|---|---|
| SCOTT A. PALETZ et al., | B247184 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. SC110870) |
| v. | |
| TEHMINA ADAYA et al., | |
| Defendants and Appellants. | |


APPEAL from a judgment of the Superior Court of Los Angeles County, Chester Horn, Jr., Judge.  Affirmed in part, reversed in part, and remanded in part.


Gibson, Dunn & Crutcher, Marcellus A. McRae, Kahn A. Scolnick and Kimberly A. Nortman for Defendants and Appellants.


Dickstein Shapiro, James H. Turken and Christopher Kadish for Plaintiffs and Respondents.


_____

## INTRODUCTION

Defendants Tehmina Adaya and Indus Investments Inc., doing business as Shangri-La Hotel, appeal from the jury's verdict finding that Defendants discriminated against Plaintiffs in violation of the Unruh Civil Rights Act. The litigation arises out of Defendants' refusal to provide services at a hotel event to the individual Plaintiffs because they were Jewish. Plaintiff Platinum, an event promoting company, also sued Defendants for contract and tort causes of action related to the event. Defendants assert many grounds on appeal regarding sufficiency of the evidence, improper evidentiary rulings, standing, inconsistent verdicts, duplicative recovery, jury instruction errors, and improper apportionment of attorney fees awards. We affirm the jury's verdict awarding actual damages and statutory penalties under Unruh as it is supported by substantial evidence and any evidentiary concerns raised by Defendants were harmless error. We reverse the duplicative award of punitive damages stemming from intentional infliction of emotion distress. We reverse and remand the court's award of attorney fees to the extent that it abused its discretion in unreasonably apportioning attorney fees associated with Plaintiff Platinum's causes of action.

## FACTS AND PROCEDURAL BACKGROUND[1]

Defendant Adaya is an owner and operator of Defendant Shangri-La Hotel in Santa Monica, California. Plaintiff Platinum, an event promoter, had previously worked with Shangri-La to orchestrate events and parties at the hotel. In June 2010, Platinum began arranging Sunday pool parties at Shangri-La. Platinum set up the July 2010 pool party at issue in this case for the Young Leadership Group of the Friends of the Israeli Defense Forces (FIDF) to fundraise for children of fallen Israeli soldiers to attend camp in the United States.

---

[1] Consistent with the substantial evidence standard of review, we recite the relevant facts established by the record in the light most favorable to the judgment, giving Plaintiffs the benefit of every reasonable inference and resolving any conflict in the evidence in support of the judgment. (*Los Angeles Unified School Dist. v. Casasola* (2010) 187 Cal.App.4th 189, 194, fn. 1.)

Plaintiff Scott Paletz, who is the managing member of Platinum, and FIDF event organizers toured the Shangri-La facilities with the Shangri-La events manager  The events manager agreed that Shangri-La would provide FIDF with a private area marked by stanchions, pool access, towels, and drink specials, all at no charge.  Paletz met with Shangri-La's general manager and its food and beverage director, Nathan Codrey, to finalize arrangements for the pool party several times thereafter.

On the morning of the pool party, Shangri-La provided to FIDF a check-in table and towels, and cordoned off an area of the pool with stanchions and ropes for FIDF's pool party guests.  FIDF placed brochures, literature, and t-shirts on the tables, and displayed two 6-foot banners.  FIDF checked guests in, giving them blue bracelets and FIDF t-shirts.

During the beginning of the pool party, Adaya was watching the World Cup in her poolside cabana.  When she exited her cabana, she saw FIDF's guests in and around the pool, the banners and tables with literature, and the FIDF t-shirts on display.  She summoned one of her security personnel to obtain a pamphlet for her review.  The security guard walked over to the table, requested a pamphlet, and told the FIDF member at the check-in table that Shangri-La's owner wanted to know what the group was about.  The pamphlet described FIDF and the program for which the pool party was fundraising.  The security guard brought it to Adaya, who then became noticeably agitated and passed the pamphlet to others sitting with her.

Adaya then contacted Codrey, the food and beverage director who had worked with Platinum to set up the pool party.  When Codrey arrived at the hotel, Adaya told him "I don't want any [f---ing] Jews in the pool."  Although Adaya did not make this statement directly to Plaintiffs, Codrey told Paletz and possibly others that Adaya made this statement.  Codrey conveyed to some of the Plaintiffs that Adaya wanted the event shut down because they were Jewish.  Adaya further told Codrey that "[i]f my parents find out that there is a Jewish event here, they're going to pull money from me immediately."

Per Adaya's instruction, Shangri-La staff systematically shut down FIDF's pool party. Hotel staff singled out FIDF guests, identifiable by their blue wristbands, and removed them from the pool, while other hotel guests and non-guests were allowed to stay in the pool. Shangri-La staff required FIDF members to remove their banners. The staff locked the entrance gate to the pool to prevent FIDF attendees from entering or reentering the pool area. Pool staff removed the towels provided for FIDF's event and had FIDF remove the t-shirts from the tables. Shangri-La security removed the ropes and stanchions that delineated FIDF's private area at the pool. Staff also ordered all event attendees to remove their FIDF event t-shirts. Those FIDF event attendees who remained at the pool after the event was dismantled, were permitted to stay in the pool area. During this series of events, Adaya and her husband sat in a cabana next to the pool area and stared down the FIDF members for at least an hour to an hour and a half, generating a lot of tension between the parties.

The Plaintiffs became aware of Adaya's discriminatory intent either by hearing her statements from Codrey or other attendees, witnessing her behavior, or directly hearing Adaya make comments regarding FIDF's removal from the pool. For instance, one Plaintiff saw Adaya become very agitated and heard her raise her voice, instructing the security guard to "get them out, get them out, get them out." While in the restroom, a different Plaintiff overheard Adaya ask a non-Jewish woman, "[d]o you want me to get these people off the lounge chairs?" Codrey, a hotel employee, repeatedly apologized for Adaya's actions, once calling it "blatant anti-Semitism."

Plaintiffs Paletz, Stephen C. Fowler (an independent contractor of Platinum), and sixteen individuals, who were FIDF guests at the pool party, sued Defendants Adaya and Shangri-La for (1) discrimination under Unruh Civil Rights Act, Civil Code section[2] 51, (2) intentional infliction of emotional distress, (3) negligent infliction of emotional distress, and (4) negligence. Plaintiff Platinum sued Shangri-La for breach of contract

---

[2]     All subsequent statutory references are to the Civil Code, unless indicated otherwise.

4

and related causes of action. At trial, the court admitted Codrey's deposition testimony regarding Adaya's statements made to him at the pool. Plaintiffs also testified at trial to the statements Codrey made to them at the pool, conveying the derogatory remarks made by Adaya. Some Plaintiffs testified to hearing Adaya's derogatory statements third or fourth hand from other FIDF guests at the pool. Over Defendants' objections, the court additionally admitted expert testimony from a Rabbi, which characterized Adaya's behavior as anti-Semitic and discussed the Plaintiffs' reaction to the events that occurred at Shangri-La. The court permitted evidence that Adaya was Pakistani and Muslim, again over Defendants' objections. After a 10-day trial followed by six days of jury deliberation, the jury returned a verdict in favor of Plaintiffs.

The jury found that Defendants had discriminated against each individual Plaintiff in violation of Unruh. The jury found that Defendants had been negligent and committed negligent infliction of emotional distress toward various Plaintiffs. The jury also found that Defendants had intentionally inflicted emotional distress on 11 Plaintiffs. Each individual Plaintiff was awarded compensatory damages and Unruh statutory penalties against Defendants; these combined awards ranged from $26,000 to $180,000 for each Plaintiff. In a separate, second phase of the trial, the jury also awarded $405,000 in punitive damages to the 11 individual Plaintiffs that it determined to be victims of intentional infliction of emotional distress. The punitive damage awards ranged from $25,000 to $80,000 for each of the 11 individuals. Adaya and Shangri-La were each 50 percent responsible for damages.

The jury further determined that Shangri-La had breached its oral agreement with Platinum, breached the implied covenant of good faith and fair dealing, made negligent misrepresentations, and negligently and intentionally interfered with a prospective economic advantage. The jury awarded Platinum $11,250 in damages and $40,000 in punitive damages for intentional interference with prospective economic advantage.

Collectively, Plaintiffs were awarded $1,654,250.  The court additionally awarded the individual Plaintiffs $2,099,785.50 in attorney fees on Unruh Act claims, along with costs amounting to $40,911.47.  Notably, the same law firm represented all Plaintiffs. Defendants filed motions for a new trial and for judgment notwithstanding the verdict; both were denied.

**DISCUSSION**

Defendants raise many issues on appeal, arguing that:  (1) there is insufficient evidence to support a finding of unlawful intent for the intentional infliction of emotional distress and Unruh Act claims; (2) the court abused its discretion on evidentiary rulings related to hearsay, expert testimony, and character evidence, warranting reversal; (3) one Plaintiff lacked standing to assert an Unruh claim; (4) Defendants owed no duty to Plaintiffs sufficient to support a claim for negligence or negligent infliction of emotional distress; (5) the jury provided inconsistent and irreconcilable verdicts by rendering verdicts in favor of eleven Plaintiffs for both negligent and intentional infliction of emotional distress; (6) the punitive damages award was improper; (7) there was an instructional error in calculating statutory penalties that requires a new trial; and (8) the attorney fees award was improperly apportioned and calculated.

1.      *Substantial Evidence Supports Unlawful Intent for Unruh Claim*

Defendants assert that Plaintiffs' Unruh claims must fail because they did not establish the requisite intent for Unruh. "When findings of fact are challenged in a civil appeal, we are bound by the familiar principle that 'the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the findings below." (*Oregel v. American Isuzu Motors, Inc.* (2001) 90 Cal.App.4th 1094, 1100.)  "We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor in accordance with the standard of review so long adhered to by this court." (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660.)

In *Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1175 (*Harris*), superseded on other grounds by Civil Code section 51(f), the Supreme Court held that "a plaintiff seeking to establish a case under the Unruh Act must plead and prove intentional discrimination in public accommodations in violation of the terms of the Act." This means "willful, affirmative misconduct on the part of those who violate the Act." (*Harris*, at p. 1172.) Substantial evidence supports the jury's finding here that Defendants intentionally discriminated against Defendants. Multiple people testified to Adaya's negative reaction to finding out that Shangri-La was hosting a Jewish event and that she shortly thereafter shut down FIDF's pool party. Testimony also establishes that Adaya made anti-Semitic remarks about the FIDF members in her pool, indicating to staff that she wanted them removed because they were Jewish.

For instance, Plaintiff Nicholas Morrison testified to Adaya's negative reaction to the pamphlet, which preceded her systematic shutdown of the pool party. At the time of the pool party, Morrison was the vice president of programming on the executive board of FIDF, who helped plan the event at Shangri-La's pool. Morrison testified that he was working at the check-in table during the FIDF event, where he distributed wristbands and FIDF t-shirts to attendees. Morrison stated that a hotel security guard approached him at the check-in table and asked him for one of the FIDF pamphlets. The security guard identified himself as a hotel employee and told Morrison, "[t]he owner is interested in who you are and . . . what your organization is." Morrison watched the security guard walk over to Adaya and give her the pamphlet. Morrison testified that Adaya's reaction to reading the pamphlet was "not positive." Describing her reaction, Morrison testified: "[i]t was very agitated. Arms flailing and handing it to the people that she was sitting with. And you could see her gesturing towards it as they were reading it. It wasn't a 'how wonderful, this is fantastic.' There was a distinct reaction that was negative." Shortly thereafter, Adaya shut down FIDF's event.

Shangri-La's former employee Nathan Codrey's deposition testimony was also admitted at trial, and directly established that Adaya made anti-Semitic remarks, which illustrated her discriminatory motivation for shutting down their event. Codrey testified that Adaya told him, "I don't want any [f---ing] Jews in the pool." Codrey further stated that Adaya said, "[i]f my parents find out that there is a Jewish event here, they're going to pull money from me immediately." Codrey described Adaya as visibly upset and testified that Adaya said that she wanted the group out immediately. Codrey stated that Adaya yelled at him: "I can't have this [f---ing] event. This is ridiculous. I can't believe that this was approved. Who approved this? Who knew about this? My family or my parents will pull money from me."

Codrey also testified that Adaya's husband soon thereafter showed up, visibly upset. Codrey stated that "[h]e made matters a lot worse because [both Adaya and her husband] sat in the front -- in the far corner cabana located next to the jacuzzi and started to -- and stared at the [FIDF guests]. Just stared them down. . . . You could cut the tension with a knife there. It was very chaotic and -- and then at times very, very quiet." He testified that the staring lasted for at least an hour to an hour and a half.

Codrey additionally explained how Adaya systematically shut down FIDF's pool party. Codrey testified that, Adaya first stated that no literature was to be passed out. She then told Codrey to tell FIDF to take their shirts off, which said FIDF. Third, she mandated that they were not allowed in the pool. His testimony clearly established that Defendants' conduct in depriving Plaintiffs of services was intentional and motivated by discrimination.

To the extent that Defendants assert that their denial of hotel services to Plaintiffs was based on Shangri-La's "valid policies and practices" and not discrimination, we reiterate that we view the evidence in the light most favorable to Plaintiffs, the prevailing party. Moreover, Defendants' assertion that Plaintiffs were denied services because they violated hotel policies mischaracterizes the evidence. There was evidence that a previous pool party at Shangri-La, which occurred only a month prior to the FIDF event, was not constrained by these "policies." Furthermore, the policies at issue never existed in

8

writing, and appeared to be applied at the whims of Adaya, who testified that pool access was determined on a "day-to-day basis" by "whoever is managing that particular day."

We conclude that the testimony quoted and summarized above describing Adaya's poolside conduct and speech clearly establishes that Defendants intentionally deprived Plaintiffs of the hotel services because they were Jewish. Substantial evidence supports the jury finding of intentional discrimination. We therefore affirm the jury's intent findings as to Unruh.

2. *Evidentiary Issues Raised by Defendants Do Not Warrant Reversal*

We review the trial court's rulings admitting evidence for abuse of discretion. (*Nevarrez v. San Marino Skilled Nursing &Wellness Centre* (2013) 221 Cal.App.4th 102, 117.) The trial court has broad authority "with respect to rulings that turn on the relevance of the proffered evidence." (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 281.) The court abuses its discretion when it makes "arbitrary, capricious, or patently absurd" decisions. (*Hernandez v. Amcord, Inc.* (2013) 215 Cal.App.4th 659, 678.) "In addition, evidentiary rulings which are based on a misunderstanding of the law are an abuse of discretion." (*Ibid.*) To the extent the court did not provide a rationale for its evidentiary decisions, "[a] ruling on the admissibility of evidence implies whatever finding of fact is prerequisite thereto." (Evid. Code § 402, subd. (c).)

a. *The Court Did Not Err in Admitting Out of Court Statements Made by Adaya to Codrey*

Defendants assert that the court abused its discretion in allowing each of the Plaintiffs to provide hearsay testimony regarding statements made by Adaya to Codrey. Defendants identify two kinds of hearsay testimony: (1) Plaintiffs' testimony about Adaya's statements to Codrey that they heard directly from Codrey and (2) Plaintiffs' testimony about Adaya's statements to Codrey that they heard third or fourth hand from other members of FIDF.

9

i.    *Defendants Waived Hearsay Objections to Plaintiffs' Testimony Regarding Hearing Adaya's Statements From Other FIDF Members*

We begin by addressing Plaintiffs' arguments that Defendants waived their hearsay arguments in failing to object to hearsay at trial.  Although it appears that Defendants properly objected to the first type of testimony regarding statements heard directly from Codrey, Defendants failed to object to the latter type of testimony, where Plaintiffs stated they heard Adaya's statement third or fourth hand from other FIDF guests.  Prior to trial, Defendants brought a motion in limine requesting the court to exclude potential hearsay statements regarding profane and anti-Semitic statements made by Adaya.  In their motion, Defendants asserted that:  "[t]he individual Plaintiffs have claimed damages from what Defendant [Adaya] is alleged to have said, yet none of the Plaintiffs actually heard Ms. Adaya say anything profane or anti-Semitic at the event.  All of the claims in that regard are rooted in inadmissible hearsay, and there are no exceptions to the Hearsay Rule that would allow introduction of the alleged comments admittedly not heard by any of the Plaintiffs in this case."  The court denied the motion without prejudice, explaining that the motion "raise[d] evidentiary issues that can only be addressed at trial."

To preserve an objection for appeal via a motion in limine, the objection must be "specific, . . . directed to an identifiable body of evidence, and . . . advanced at a time when the trial judge could give fair consideration to the admissibility of the evidence in its context."  (*People v. Morris* (1991) 53 Cal.3d 152, 189 disapproved on other grounds in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1).  In Defendants' hearsay motion in limine, Defendants failed to identify Adaya's specific statements that were at issue, nor did they identify the testimony they expected each Plaintiff to provide at trial that they sought to exclude.  Not only was the objection too general, but it was advanced too early, at an interval where the court could not assess the evidence in the appropriate context.  The court made it clear that the hearsay objections could only be assessed at trial when the particular out of court statements at issue were evident.  Thus, the motion in limine did not preserve any of Defendants' hearsay objections.

At trial, Defendants made a single hearsay objection when Plaintiffs' counsel elicited testimony about statements Plaintiff Ari Ryan heard directly from Codrey. When Plaintiffs' counsel asked Ryan what Codrey told him about Adaya's statements, defense counsel objected on hearsay grounds. The court overruled the objection and Ryan testified to what Codrey had told him. This objection suffices to preserve Defendants' admissibility arguments regarding the first kind of hearsay identified by Defendant: Plaintiffs testifying to what Codrey directly told them Adaya said. (See *People v. Antick* (1975) 15 Cal.3d 79, 95 [a party need not make a continuing objection to a particular line of evidence once the party's initial objection to that line of evidence has been overruled], disapproved on other grounds by *People v. McCoy* (2001) 25 Cal.4th 1111, 1123.)

Yet, Defendants never objected at trial to the second kind of hearsay regarding third-or-fourth-hand accounts of Adaya's remarks, nor did their motion in limine even alert the court to this type of triple or quadruple hearsay. "To obtain reversal based on the erroneous admission of evidence, the record must show a timely objection making clear that specific ground. ([Evid. Code,] § 353; *In re C.B.* (2010) 190 Cal.App.4th 102, 132 [117 Cal.Rptr.3d 846] [hearsay objections 'waived by the failure to object below'].) Lack of such objection deprives the proponent of the evidence an opportunity to establish a better record or some alternative basis for admission." (*Duronslet v. Kamps* (2012) 203 Cal.App.4th 717, 726.)

Here, Defendants failed to object to Plaintiffs' testimony providing third-or-fourth-hand accounts of Adaya's statements. Importantly, the trial court would have engaged in a different analysis to address this hearsay objection, as additional layers of out-of-court statements were at issue. Defendants never presented Plaintiffs with an opportunity to provide a valid basis for its admission and never gave the court an opportunity to contemplate and rule on the issue. Because Defendants did not object, they forfeited their claim that the court erred by admitting this second type of hearsay evidence. We thus only address the admissibility of Plaintiffs' testimony regarding out of court statements heard directly from Codrey.

11

*ii.* *Plaintiffs' Testimony About Adaya's Statement As Heard Directly from Codrey Was Not Hearsay*

Defendants contend that the court abused its discretion by admitting Plaintiffs' testimony about how they heard from Codrey that Adaya did not want them in the pool because they were Jewish. Adaya's underlying statement at issue is: "I don't want any [f---ing] Jews in the pool." Defendants concede that the communication from Adaya to Codrey was not inadmissible hearsay. Defendants assert that "[t]he abuse of discretion arose once the testimony got beyond this alleged direct communication between Mr. Codrey and Ms. Adaya, and went to Plaintiffs, who were allowed to testify . . . that . . . [they] heard Ms. Adaya's comments second-hand from Mr. Codrey." Defendants argue that "[n]o exceptions applied to these final layers of hearsay from Mr. Codrey to Plaintiffs."

Hearsay is an out-of-court statement that is offered for the truth of the matter asserted, and is generally inadmissible. (Evid. Code, § 1200, subd. (a).) Conversely, an out-of-court statement is not hearsay when it is offered for other purposes. For example, "[a]n out-of-court statement is not hearsay if offered to show the effect on the hearer, reader or viewer rather than to prove the truth of the content of the statement—e.g., that a party had prior notice or knowledge; that a party was given a warning; or to prove a party's motive, good faith, fear, etc. (where such notice, knowledge, motive, fear, etc. is relevant to an issue in the case)." (Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 2013) ¶ 8:1049, italic omitted.) An extrajudicial statement is not hearsay if used " 'to prove . . . the . . . hearer . . . obtained certain information by hearing . . . the statement and, believing such information to be true, acted in conformity with such belief.' [Citation.] . . . 'The statement is not hearsay, since it is the hearer's reaction to the statement that is the relevant fact sought to be proved–not the truth of the matter asserted in the statement.' " (*Holland v. Union Pacific Railroad Co.* (2007) 154 Cal.App.4th 940, 947, quoting 1 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) Hearsay & Nonhearsay, § 1.4, p. 57, italics omitted.) "However, '[a] hearsay objection to an out-of-court statement may not be overruled simply by identifying a nonhearsay

12

purpose for admitting the statement. The trial court must also find that the nonhearsay purpose is relevant to an issue in dispute.' [Citation.]" (*People v. Jablonski* (2006) 37 Cal.4th 774.)

Here, the specific statement at issue is Codrey telling Plaintiffs that Adaya said she did not want Jewish people in her pool. The truth of the matter asserted in the statement is that Adaya made the anti-Semitic statement. We reason, and Defendants appear to agree, that Plaintiffs' testimony was not being offered to prove that Adaya actually made the statement. In their appellate brief, Defendants assert that "the comments were being offered to prove that Mr. Codrey in fact related these statements to others, which caused them distress." We agree. The purpose of Plaintiffs testifying to what they heard from Codrey was to show the effect of Codrey's statement on the listener: to show that Plaintiffs understood that they were being removed from the pool due to their religion, which gave them cause for emotional distress. This nonhearsay purpose for admitting the testimony is highly relevant to proving general damages for emotional distress and mental anguish in Plaintiffs' tort and Unruh causes of action.

It is well established in California that out-of-court statements, when offered to show the effect on the hearer, are admissible nonhearsay, as long as they are relevant. (See *Cantrell v. Zolin* (1994) 23 Cal.App.4th 128, 132–133 [The police officer's statement that motorist was weaving was admissible, not to prove weaving, but to show that the police officer had reasonable cause to stop motorist.]; *People v. Dehnel* (1979) 99 Cal.App.3d 404, 408–409, [In a conspiracy to commit murder case, triple level out-of-court statement testimony, stating that Defendant had killed people before, was admissible on behalf of the codefendant as circumstantial evidence of his state of mind]; *Wiz Technology, Inc. v. Coopers & Lybrand* (2003) 106 Cal.App.4th 1, 13 [A declaration by defendant auditor that he had learned of the plaintiff's breach of certain contract terms from other persons was not inadmissible hearsay because it was offered to prove the auditor's good faith in refusing to perform the audit.]; *People v. Jablonski, supra,* 37 Cal.4th at p. 820 [A victim's statement that she was afraid of the defendant was admissible to show, not that she was actually afraid, but rather to show the statement's

13

effect on the defendant and his premeditation of the crime.]; *Estate of Nidever* (1960) 181 Cal.App.2d 367, 380 [Affidavits with multiple layers of out of court statements were admissible over hearsay objections, when offered to show their effect on a person's mental state as to her belief in the validity of her marriage].) Consistent with these cases, Plaintiffs' testimony regarding Codrey's statements were offered to show their effect on Plaintiffs and support damages for emotional distress.

Furthermore, even if admission of this evidence could be construed as error, it was harmless. (*Grail Semiconductor, Inc. v. Mitsubishi Electric & Electronics USA, Inc.* (2014) 225 Cal.App.4th 786, 799 [To obtain reversal, "[t]he appellant bears the burden of establishing that the error was prejudicial."].) At trial, Codrey's deposition testimony was read into the record. Among the many excerpts read to the jury, counsel read Codrey's testimony stating that Adaya told him, "I don't want any [f---ing] Jews in the pool." They also read the testimony where Codrey stated that he told Plaintiff Scott Paletz that Adaya made this statement and possibly others overheard him tell Paletz. Therefore, Plaintiffs' additional testimony regarding what they heard from Codrey, or even what they heard from others third or fourth hand, is cumulative. It is not reasonably probable that a result more favorable to Defendants would have been reached if Plaintiffs' testimony regarding statements from Codrey was excluded, as the jury was already well aware of Adaya's discriminatory comments. (See *Huffman v. Interstate Brands Corp.* (2004) 121 Cal.App.4th 679, 692, (*Huffman*) ["In civil cases, a miscarriage of justice should be declared only when the reviewing court, after an examination of the entire cause, including the evidence, is of the opinion that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error."].)

b.  *Admission of Expert Testimony and Evidence of Adaya's Religion and Nationality Was Not Prejudicial Error*

Defendants assert that the court's admission of expert testimony from Rabbi Wolpe and evidence of Adaya's Pakistani Muslim background was prejudicial error. Rabbi Wolpe testified that "several [Plaintiffs] were traumatized by what happened," and that "the conduct of . . . those . . . ultimately responsible at the hotel could fairly be characterized as anti-Semitic." Defendants argued that this testimony should have been excluded because it was the subject of common knowledge and such testimony usurped the jury's role as fact finder. As to the character evidence, Defendants assert that evidence of Adaya's religion and nationality were inflammatory, evoked an emotional reaction with the jury, and lacked any probative value. In addition to other references regarding Adaya's religion and nationality, the portion of Codrey's deposition provided to the jury also stated that during the pool party conflict, Adaya "kept repeating that . . . this was embarrassing to her; that she is a Muslim, her parents or family are Muslims, and this is just absolutely wrong."

Assuming without deciding that the admission of Rabbi Wolpe's expert testimony and testimony regarding Adaya's Pakistani Muslim background was error, we conclude that it was not prejudicial and does not require reversal. "A judgment will not be set aside based on the erroneous admission of evidence unless 'the reviewing court is convinced after an examination of the entire case, including the evidence, that it is reasonably probable a result more favorable to the appellant would have been reached absent the error. [Citations.] Prejudice from error is never presumed but must be affirmatively demonstrated by the appellant. [Citations.]' [Citation.]" (*Hernandez v. County of Los Angeles* (2014) 226 Cal.App.4th 1599, 1616; Cal. Const., art. VI, § 13; Code Civil Proc., § 475.)

Where an abundance of evidence supports the verdict, the erroneous admission of other evidence is harmless error, as it is not reasonably probable that the jury would have reached a verdict more favorable to the opposing party. (*Bender v. County of Los Angeles* (2013) 217 Cal.App.4th 968, 984 [The trial court's admission of evidence of arrestee's acquittal was harmless in arrestee's action against deputy and county alleging that he was arrested without probable cause, beaten, and pepper sprayed in violation of the Bane Act, where the record showed an abundance of evidence from disinterested witnesses that deputy arrested him without any reason to do so, and pepper-sprayed and beat him while he was handcuffed and unresisting.]; *Bisno v. Herzberg* (1946) 75 Cal.App.2d 235 [The admission of inadmissible evidence was harmless where "the proof was abundant without it."]; *Bailey v. Market St. Ry. Co.* (1935) 3 Cal.App.2d 525, 532 ["[A]s to each fact erroneously admitted there was an abundance of other evidence on the same subject which was properly admitted and therefore the defendant suffered no prejudice."]; *Margolis v. Teplin* (1958) 163 Cal.App.2d 526, 532–533 ["[T]he error in the admission of some hearsay evidence (in an action tried by the court without a jury) is not prejudicial error, where there is otherwise enough competent evidence in the record to support the findings"].)

Here, an abundance of evidence supported Plaintiffs' theory that Defendants discriminated against them because they were Jewish and that Defendants' actions were anti-Semitic. Testimony from the 18 individual Plaintiffs all described Adaya's behavior and how they were systematically denied hotel services based on their religion. As provided in the first section of the Discussion, testimony from Plaintiff Nicholas Morrison established that Adaya had a very negative reaction when she learned that Shangri-La was hosting a pool party for a Jewish organization. Quickly thereafter, Adaya dismantled the event. Furthermore, the court admitted Codrey's testimony that Adaya stated: "I don't want any [f---ing] Jews in the pool." Codrey's testimony also stated that Adaya said, "[i]f my parents find out that there is a Jewish event here, they're going to pull money from me immediately." This evidence alone was highly probative of Plaintiffs' causes of action such that it was not reasonably probable a result more

16

favorable to the appellant would have been reached had the court excluded expert testimony from Rabbi Wolpe and evidence of Adaya's Pakistani Muslim background.

In light of the extensive evidence and particularly probative testimony regarding Adaya's anti-Semitic statements and actions presented by Plaintiffs, we conclude that any error with regard to these evidentiary rulings was harmless.

3. *Plaintiff Nussdorf Had Standing to Bring an Unruh Act Claim*

Defendants assert that Plaintiff Adrianna Nussdorf lacked standing to bring claims under the Unruh Act because she does not qualify as a "person aggrieved" under the statute. (See § 52, subd. (c) ["any person aggrieved by the conduct [of persons violating Unruh] may bring a civil action in the appropriate court by filing with it a complaint"].) Defendants base their argument on Nussdorf's testimony that her initial reaction to the events at the pool party was that she thought it was ridiculous to speculate that FIDF members were being discriminated against and that the group was blaming the hotel for a poorly organized event.

This argument mischaracterizes Nussdorf's testimony. Nussdorf testified that she did not fully understand what was happening when the pool party was being shut down because she was stunned that the Appellants' conduct would be motivated by discrimination. Nussdorf further testified that after she understood what happened, the events made her feel terrible and had such an impact on her that she visited two doctors and began taking medication for sleeplessness and anxiety We conclude that this is sufficient evidence to show that she was a "person aggrieved" under Unruh.

4. *Punitive Damages Must be Reversed as Plaintiffs Received Statutory Penalties Under Section 52, Subdivision (a) that Were Punitive in Nature*

Defendants assert that the "trial court erroneously permitted 11 Plaintiffs to collect double punishment for the same alleged conduct—first in the form of statutory Unruh Act 'penalties' and second in the form of 'punitive damages' in connection with their [intentional infliction of emotional distress] claims." The court here awarded statutory penalties under section 52, which provides that, "[w]hoever denies, aids or incites a denial, or makes any discrimination or distinction contrary to Section 51 . . . is liable for

17

each and every offense for the actual damages, *and any amount that may be determined by a jury, or a court sitting without a jury, up to a maximum of three times the amount of actual damage* but in no case less than four thousand dollars ($4,000) . . . ." (Emphasis added.) Defendants contend that statutory damages under Unruh, which allow a jury to award up to three times the amount of actual damage, are punitive, not compensatory. Defendants assert that because the statutory damages are punitive, Plaintiffs may not separately collect punitive damages for intentional infliction of emotional distress to punish Defendants for essentially the same conduct. We review this question of law and issue of statutory interpretation de novo. (*Babalola v. Superior Court* (2011) 192 Cal.App.4th 948, 956.)

It is well established that a plaintiff may not recover duplicative punitive damages for the same conduct. "California courts have held that if a defendant is liable for a statutory penalty or multiple damages under a statute, the award is punitive in nature, and the award penalizes essentially the same conduct as an award of punitive damages. The plaintiff cannot recover punitive damages in addition to that recovery but must elect its remedy. [Citations.] To impose both a statutory penalty or multiple damages award and punitive damages in those circumstances would be duplicative. [Citations.] We presume that the Legislature did not intend to allow such a double recovery absent a specific indication to the contrary. [Citations.]" (*Fassberg Construction Co. v. Housing Authority of City of Los Angeles* (2007) 152 Cal.App.4th 720, 759-760 (*Fassberg*).)

We conclude that the statutory damages under section 52(a) are punitive in nature. "[T]he purpose of punitive damages 'is a purely *public* one. The public's goal is to punish wrongdoing and thereby to protect itself from future misconduct, either by the same defendant or other potential wrongdoers.' " (*Power Standards Lab, Inc. v. Federal Express Corp.* (2005) 127 Cal.App.4th 1039, 1047, citing *Adams v. Murakami* (1991) 54 Cal.3d 105, 110 [284 Cal.Rptr. 318, 813 P.2d 1348].) In *Harris, supra,* 52 Cal.3d at p. 1172, the Supreme Court explained that section 52, subdivision (a)'s "damages provision allowing for an exemplary award of up to treble the actual damages suffered with a stated minimum amount reveals a desire to punish intentional and morally

18

offensive conduct." The Court expressly called the treble damages provision "a punitive award." (*Id.* at p. 1152, fn. 5; *Botosan v. Fitzhugh* (S.D.Cal. 1998) 13 F.Supp.2d 1047, 1052 ["The phrase 'any amount as may be determined by a jury' refers to punitive damages."].) As Unruh's statutory damages are punitive, we must determine whether (a) the legislature intended for a double recovery of punitive damages under Unruh, and (b) if not, whether the punitive damages at issue were based on the same conduct.

*(a) The Legislature Did Not Intend to Allow Double Recovery*

We begin with the presumption that absent a specific indication otherwise, the legislature did not intend to allow for double recovery of punitive damages under section 52, which sets forth the damages that can be recovered for Unruh violations. (See *Fassberg, supra,* 152 Cal.App.4th at p. 760.) To rebut this presumption, Plaintiffs argued at oral argument that the language of section 52, subdivision (e) indicated that Unruh's damages were cumulative in nature. Section 52, subdivision (e) states that "[a]ctions brought pursuant to this section are independent of any other actions, remedies, or procedures that may be available to an aggrieved party pursuant to any other law."

In interpreting the meaning of subdivision (e), we apply the canons of statutory construction. "Under settled canons of statutory construction, in construing a statute we ascertain the Legislature's intent in order to effectuate the law's purpose." (*Imperial Merchant Services, Inc. v. Hunt* (2009) 47 Cal.4th 381, 387.) We do this by first looking to the plain meaning of the statute's language; the usual and ordinary meaning of the words is controlling unless the words are ambiguous. (*Id.* at p. 387-388.) We also "give effect, whenever possible, to the statute as a whole, and to every word and clause thereof, leaving no part of the provision useless or deprived of meaning." (*Eisenhower Medical Center v. Superior Court* (2014) 226 Cal.App.4th 430, 435.) In doing so, we do not "add or subtract words to or from the statute." (*Scottsdale Indemnity Co. v. National Continental Ins. Co.* (2014) 229 Cal.App.4th 1166, 1172.) " 'If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy.' [Citation.]" (*Imperial Merchant Services, Inc. v. Hunt, supra,* 47 Cal.4th at p. 388.)

19

Here, subdivision (e) states that "[a]ctions" are independent of "other actions, remedies, or procedures" that a plaintiff can pursue. Applying the usual and ordinary meaning of these words, it is clear that subdivision (e) permits a plaintiff to bring an Unruh cause of action while bringing other causes of action or seeking other remedies. Notably, subdivision (e) does not state that *remedies* under Unruh are independent of other remedies a plaintiff may seek. Plaintiffs' proposed construction requires us to read additional words into subdivision (e) in order to reach the conclusion that Unruh's remedies are independent of other remedies. As stated above, the canons of statutory construction prohibit us from adding words to the statutory language in interpreting the statute. Our interpretation of subdivision (e) is also supported by legislative history, which indicates that subdivision (e) was added to in order to create a private right of action for aggrieved persons, in addition to their preexisting, previously exclusive remedy of filing a complaint with the Fair Employment Practices Commission. (Assem. Com. on Labor Relations, Analysis of Assem. Bill 2986 (1975-1976 Reg. Sess.) Apr. 20, 1976 Report; Assem. Com. On Ways & Means, Staff Analysis of Assem. Bill No. 2986 (1975-1976 Reg. Sess.) as amended April 26, 1976.)

We therefore conclude that section 52 does not permit duplicative recovery of punitive damages for the same conduct. Had the legislature intended for plaintiffs to be able to have an Unruh remedy independent of other remedies, it would have explicitly said so. (See *Troensegaard v. Silvercrest Industries, Inc.* (1985) 175 Cal.App.3d 218, 228 ["We are of the opinion that had the Legislature, by Civil Code sections 3294 (permitting *punitive damages* ) and 1794 (permitting a *civil penalty*), intended a double recovery of punitive and penal damages for the same willful, oppressive, malicious, and oppressive acts, it would in some appropriate manner have said so."].) Thus, the remaining issue is whether the statutory Unruh damages and the intentional infliction of emotional distress damages were based on the same conduct.

*(b)  Defendants Have Violated a Single Primary Right, Giving Rise to a Single Cause of Action for Punitive Damages*

The Supreme Court has explained that "a 'cause of action' is comprised of a 'primary right' of the plaintiff, a corresponding 'primary duty' of the defendant, and a wrongful act by the defendant constituting a breach of that duty.  [Citation.]  The most salient characteristic of a primary right is that it is indivisible: the violation of a single primary right gives rise to but a single cause of action.  [Citation.]"  (*Crowley v. Katleman* (1994) 8 Cal.4th 666, 681.)  "Although 'the phrase "causes of action" is often used indiscriminately . . . to mean *counts* which state differently the same cause of action' [citation], its more precise meaning 'is the right to obtain redress for a harm suffered' [citation].  ' "Even where there are multiple legal theories upon which recovery might be predicated, *one injury gives rise to only one claim for relief*." ' [Citations.]"  (*Hayes v. County of San Diego* (2013) 57 Cal.4th 622, 631.)  Meaning, where one primary right has been violated, i.e. one injury incurred, a plaintiff can only be awarded punitive damages once.  (See *Plotnik v. Meihaus* (2012) 208 Cal.App.4th 1590, 1611-1612 [Where the plaintiff suffers a single injury, the jury's special verdict awarding emotional distress damages on several separate theories of negligence, trespass, negligent infliction of emotional distress, and intentional infliction of emotional distress, was impermissible double recovery.].)

The record shows that the individual Plaintiffs each suffered one injury: Defendants discriminated against them by refusing to provide them services at the hotel pool because they were Jewish.  This is supported by Plaintiffs' testimony, which identifies a course of conduct systematically depriving Plaintiffs of hotel amenities and services that was motivated by discrimination.  For instance, Plaintiff Laura Lugash summarizes the events at the pool that led her to believe the conduct was antisemitic as, "being stopped before entering the pool, being told to get out of the pool, and watching [Adaya] gesturing and being angry."  Her summary describes the heart of this lawsuit: deprivation of pool amenities due to discrimination.  Although each Plaintiff had a different experience at the pool and different reactions to Defendants' behavior, all

21

suffered the same primary right violation of being deprived of pool amenities due to Defendants' anti-Semitism. Plaintiffs' intentional infliction of emotional distress and Unruh causes of action are simply two different legal theories for recovering punitive damages for that same injury.

Plaintiffs argue that they did not receive "an award of statutory penalties and punitive damages based on the same conduct," asserting that "the jury based its findings on separate acts of misconduct." Plaintiffs support this argument by citing the trial court's decision denying Defendants' motion for judgment notwithstanding the verdict on this issue. There, the court stated that the jury's "careful distinctions are apparent in the damages awards in [that] the jury's verdict as to each of the plaintiffs strongly suggests that the jury was making such distinctions on different acts and impacts suffered by each plaintiff."

Based on our review of the record, we conclude that it is unreasonable to assume that the jury's findings were based on separate acts of misconduct because Defendants' conduct was not easily divisible. Although Plaintiffs generally state that there was a wide array of different acts carried out over many hours, Plaintiffs fail to indentify for this Court the different acts that were specifically attributable to the Unruh violation and the intentional infliction of emotional distress for each of the nine Plaintiffs who received statutory and punitive damages. Nor do Plaintiffs identify multiple primary rights that have been violated. As explained above, based on our review of the record, Plaintiffs suffered injury from the violation of a single primary right as Defendants' conduct consisted of depriving Plaintiffs of Shangri-La's pool amenities based on a discriminatory motive. Additionally, the distinctions in the damages awards are most noticeable when comparing awards received by different Plaintiffs, and appear to be the product of each Plaintiff's testimony regarding the varying impacts Defendants' conduct had on them individually.

22

Plaintiffs also argue that any ambiguity that exists in the jury verdicts was invited by Defendants and as such, it is not a basis for reversal of the punitive damages award. "Under the doctrine of 'invited error' a party cannot successfully take advantage of error committed by the court at his request. Thus, on appeal a litigant cannot object to the admission of incompetent evidence offered by him. [Citation.] He cannot complain of error in instructions requested by him. [Citations.] Nor can he challenge a finding of the trial court made at his instance. [Citations.]" (*Jentick v. Pacific Gas & Elec. Co.* (1941) 18 Cal.2d 117, 121.) "The doctrine of invited error bars an appellant from attacking a verdict that resulted from a jury instruction given at the appellant's request." (*Stevens v. Owens–Corning Fiberglas Corp.* (1996) 49 Cal.App.4th 1645, 1653.)

Here, Defendants never requested the court to issue an incorrect instruction, nor did they object to an instruction that would have remedied this issue. Rather, Plaintiffs proposed an instruction (a modified version of Judicial Council of California Civil Jury Instructions No. 3934) that stated:

"The following additional items of damages are recoverable only once per Plaintiff suing for Discrimination, Intentional Infliction of Emotional Distress, Negligent Infliction of Emotional Distress, Intentional Interference with Contractual Relations, and Intentional Interference with Prospective Economic Advantage:

1. Exemplary and/or punitive damages.

The following additional items of damages are recoverable only once per Plaintiff suing for Discrimination:

1. Statutory damages in the minimum amount of $4,000."

Contrary to Plaintiffs' assertion that this instruction "was designed to avoid juror confusion" and "*would have informed the jury it could not award duplicative damages for the same act*," (emphasis in original) this proposed instruction did not address the issue of duplicative damages in the context of awarding punitive damages and punitive statutory penalties for the same conduct. Defendants appropriately objected to this instruction at trial to the extent that it appeared to allow for duplicative recovery of

23

punitive damages. Thus, in having the court dispose of this instruction, Defendants took no affirmative steps to invite error.

To the extent that Plaintiffs assert that the doctrine of invited error applies because Defendants did not propose an alternative instruction and did not propose special interrogatories that would "elicit information about [on] what conduct the jury based its awards," we disagree. Defendants "are deemed to have excepted to every instruction given and are therefore not barred by their failure to offer an alternative instruction from asserting error in the instruction as given. (Code Civ. Proc., § 647; *Griesel v. Dart Industries, Inc.* (1979) 23 Cal.3d 578, 583-584 & fn. 4, [overruled on other grounds by *Privette v. Superior Court* (1993) 5 Cal.4th 689, 702, fn. 4]; *Barrera v. De La Torre* (1957) 48 Cal.2d 166, 170 [308 P.2d 724].)" (*Agarwal v. Johnson* (1979) 25 Cal.3d 932, 949, overruled on another ground in *White v. Ultramar* (1999) 21 Cal.4th 563, 574, fn. 4.) "To hold that it is the duty of a party to correct the errors of his adversary's instructions, or to submit better instructions upon his adversary's theory of the case, would be in contravention of section 647, Code of Civil Procedure, which gives a party an exception to instructions that are given. That is the equivalent of a specific objection to all his adversaries' instructions." *Hensley v. Harris* (1957) 151 Cal.App.2d 821, 826; *Rivera v. Parma* (1960) 54 Cal.2d 313, 316 [stating the same].) Here, Defendants had no duty to submit an instruction that furthered Plaintiff's theory of the case that the Unruh and intentional infliction of emotional distress causes of action were based on different conduct. Defendants are thus not estopped from raising this error simply because they did not propose alternative instructions or interrogatories on this topic at trial.

Moreover, because the Unruh violation and the intentional infliction of emotional distress claim are based on the same conduct, a different jury instruction or the use of special interrogatories were not the solution to preventing duplicative recovery of punitive damages. Plaintiffs were entitled to pursue both legal theories (which were both premised on Defendants' violation of the same primary right) until the jury rendered its verdict. (*North American Chemical Co. v. Superior Court* (1997) 59 Cal.App.4th 764, 774 [Where there are multiple legal theories for a violation of a single right, "the plaintiff

24

is entitled to pursue both legal theories until an occasion for an election of remedies arises."].)  At that point in time, Plaintiffs were to have elected their remedies. (*Fassberg, supra,* 152 Cal.App.4th at pp. 759-760 ["California courts have held that if a defendant is liable for a statutory penalty or multiple damages under a statute, the award is punitive in nature, and the award penalizes essentially the same conduct as an award of punitive damages.  The plaintiff cannot recover punitive damages in addition to that recovery but must elect its remedy."].)  Therefore, Plaintiffs cannot receive both awards and must elect their remedy.

As the award from the Unruh statutory penalties received by each individual Plaintiff is greater than that awarded for their individual emotional distress punitive damages, we conclude that emotional distress punitive damages awarded in phase two of the trial must be reversed.  Notably, this ruling does not affect Plaintiff Platinum's award of punitive damages, which does not overlap with any other punitive relief.

     5.     *Instructions Related to Statutory Penalties Did Not Result in Error*

Defendants assert that the "trial court issued two sets of improper jury instructions regarding the calculation of Unruh Act statutory penalties."  Defendants contend that the "court ultimately erred by instructing the jury to award three times the actual damages in statutory penalties, which removed the jury's discretion in determining the amount of penalties."  To the extent that Plaintiffs argue that Defendants failed to object to the instruction and thus waived this issue on appeal, "in a civil case, a party is deemed to have objected to an erroneous jury instruction; there is no waiver for failure to object. (*Huffman*[*, supra,*] 121 Cal.App.4th [at p.] 705, 17 Cal.Rptr.3d 397.)"  (*Maureen K. v. Tuschka* (2013) 215 Cal.App.4th 519, 530.)  We therefore address the instructional issues raised by Defendants.

25

"The court's duty to instruct the jury is discharged if its instructions embrace all points of law necessary to a decision. [Citation] A party is not entitled to have the jury instructed in any particular fashion or phraseology, and may not complain if the court correctly gives the substance of the applicable law. [Citation]" (*Thompson Pacific Construction, Inc. v. City of Sunnyvale* (2007) 155 Cal.App.4th 525, 553.) "We review challenges to the propriety of jury instructions in correctly stating the relevant law under the de novo standard of review. [Citation.]) "Not all instructional errors require reversal and a new trial. To obtain a reversal, an appellant must establish that the error was prejudicial." (*Adams v. MHC Colony Park L.P.* (2014) 224 Cal.App.4th 601, 613.) This means that it must appear reasonably probable that without the instructional error, the jury's verdict would have been more favorable to Defendants. (*Scott v. Rayhrer* (2010) 185 Cal.App.4th 1535, 1540.) " 'Here the question is, how would a reasonable juror understand the instruction. [Citation.] In addressing this question, we consider the specific language under challenge and, if necessary, the charge in its entirety. [Citation.] Finally, we determine whether the instruction, so understood, states the applicable law correctly.' [Citation.]" (*People v. Woodward* (2004) 116 Cal.App.4th 821, 834.)

The instruction at issue addressed damages that the jury could award Plaintiffs for violation of Unruh, under section 52, subdivision (a). Section 52 provides that a plaintiff can recover "actual damages, and any amount that may be determined by a jury . . . up to a maximum of three times the amount of actual damage but in no case less than four thousand dollars ($4,000)." (§ 52, subd. (a).) Here, the court provided two instructions on this issue, one instruction read to and provided in writing to the jury with the other jury instructions and one subsequent, correctional instruction regarding the jury's initially insufficient verdict. (See Code Civil Proc., § 619 ["When the verdict is announced, if it is informal or insufficient, in not covering the issue submitted, it may be corrected by the jury under the advice of the court, or the jury may be again sent out."]; *Crowe v. Sacks* (1955) 44 Cal.2d 590, 596-597 ["A verdict which goes beyond the issues of the case as stated in the instructions on the law given by the court to the jury, is not in conformity with the instructions and is therefore 'insufficient.' Instances of this are: where the jury

26

returned a verdict for $14,200 although it had been instructed by the court that the statutory maximum liability was $4,140"]; *Mizel v. City of Santa Monica* (2001) 93 Cal.App.4th 1059, 1072, [If a jury renders inconsistent verdicts, it is "prudent, economical, and judicious" for the trial court to provide further instruction for the jury to correct the inconsistencies.].)

The initial jury instruction stated: "If you decide that Plaintiffs have proved their claim against Defendants, you also must decide how much money will reasonably compensate them for the harm. This compensation is called 'damages.' [¶] Plaintiffs must prove the amount of their damages. However, Plaintiffs do not have to prove the exact amount of the harm or the exact amount of damages that will provide reasonable compensation for the harm. You must not speculate or guess in awarding damages. [¶] The following are specific items of damages claimed by Plaintiffs: [¶] Statutory damages in the minimum amount of $4,000 per Plaintiff, as well as compensatory damages for each Plaintiff's pain, suffering, inconvenience, emotional distress, medical expenses to-date, and future medical expenses. [¶] In addition, you may award Plaintiffs up to three times the amount of their actual damages as a penalty against Defendants." Based on these instructions, the jury initially awarded Unruh statutory penalties to nine Plaintiffs greater than three times the amount of the actual damages awarded.

The court sent the jury back to fix the damages award with a clarifying instruction. The court stated: "The Court has reviewed the verdict forms. . . . [W]ith respect to a number of these, . . . it appears to the court that the calculation of statutory damages awarded for the Unruh Act claims does not comply with the instructions. . . . [S]tatutory damages cannot exceed three times the amount of the actual damages, and, for example, in the case of Mr. Scott Paletz, you have awarded actual damages of [$]2500, but statutory damages of [$]30,000, which far exceeds three times [$]2500. . . . A similar error occurs in the verdict form as to Mr. Fowler, Mr. Ryan, Mr. Rubin, Mr. Newburger, Mr. Morrison, Laura Morrison, Mr. Shuman, and Mr. Gold." The court advised the jury: "I'm going to send you back in, I'm going to ask you to recalculate these. . . . I'm going to leave it up to you. You can decide whether you want to reassess the actual damages or

27

you simply want to go back and recalculate statutory damages as three times the amount you've already found, not to exceed three times the amount of actual damages you found. And if you want to do it that way, it's a simple mathematical clarification. . . . I'll ask the jurors to please go back into the jury room and make the appropriate adjustments as you see fit." The jury then returned verdicts that comported with Unruh's maximum damages requirements, awarding the nine Plaintiffs three times the amount of their actual damages for the statutory damages.

Defendants assert that the second instruction "failed to account for the fact that the jury's lump-sum actual-damages award for all claims may not have included compensation for the Unruh Act claim (or, at the very least, it is likely that not 100% of the compensatory award was for the Unruh Act claim)." We disagree. A reasonable juror would understand the court's subsequent corrective instruction to indicate that the statutory penalties were not to exceed three times the actual damages incurred by Defendants' Unruh violation, and were not to be based on any of the tort causes of action. Furthermore, the actual damages awarded under Unruh encompass the damages a plaintiff would receive under the emotional distress or negligence claims. Pursuant to section 52, subdivision (h), the actual damages that can be recovered under Unruh are both "special and general damages." Actual damages are "compensatory damages [that] include nonquantifiable general damages for emotional distress and pecuniarily measurable special damages for out-of-pocket losses." (*Walnut Creek Manor v. Fair Employment & Housing Com.* (1991) 54 Cal.3d 245, 255 [analyzing the term "actual damages" within housing anti-discrimination statute].) "[G]eneral damages are those losses which naturally flow from the injury and which are not quantifiable by reference to bills or receipts. Thus, damages for pain, suffering and emotional distress are paradigmatic examples of general damages." (*Beeman v. Burling* (1990) 216 Cal.App.3d 1586, 1600.) Actual damages defined by Unruh are the same damages that would be recovered under the tort causes of action for intentional and negligent infliction of emotional distress and negligence, e.g. pain, suffering, and emotional distress.

28

In addition, Defendants argue that the "instructions also directed the jury to award treble damages, even though the Unruh Act leaves the amount of any penalty in the jury's discretion (as long as it is greater than $4,000 and less than treble the actual damages)." Defendants state that it is possible that the "jury may have issued a lower statutory damages award had the trial court properly stated the law."

We conclude that a reasonable juror would not construe the court's corrective instruction to mandate an award of treble damages. The court clearly stated that the maximum statutory penalty was treble damages, not that it was the mandated penalty. The court repeatedly stated it was in the jury's discretion to determine what amount to award, stating "I'm going to leave it up to you. You can decide . . . I'll ask the jurors to please go back into the jury room and make the appropriate adjustments as you see fit." These instructions did not misguide the jury in their deliberations. Furthermore, Defendants' theory is not supported by the jury verdicts actually rendered. There are eight Plaintiffs who received less than three times the amount of their actual damage award on the jury's first attempt at calculating damages If the jury had understood the court's instruction to mandate treble damages under Unruh, the jury would have altered these statutory penalties accordingly. Yet, after receiving the second instruction from the court, the jury did not subsequently change these eight awards to be equal to three times the actual damages. It is apparent from the record that the jury properly understood the instruction to require them to award a maximum of treble actual damages in statutory penalties.

We thus conclude that the court properly discharged its duty to instruct the jury with regard to Unruh statutory damages when it issued the corrective instruction. We affirm statutory award of damages on this ground.

6.      *We Remand the Attorney Fee Award for the Court to Recalculate Fees Attributable to Platinum's Causes of Action*

Here, the court awarded $2,099,785.50 in attorney fees to the individual Plaintiffs. The basis for this award was Civil Code section 52, subdivision (a), which expressly allows for recovery of attorney fees for Unruh causes of action. In their motion for attorney fees related to the Unruh cause of action, Plaintiffs presented the court with an affidavit from the supervising attorney describing the work performed and reasonableness of each attorney's hourly rates, and a 140-page exhibit documenting more than two years worth of block billing entries.[3]  In their motion, Plaintiffs did not delineate between fees associated with Unruh and fees associated with the other causes of action, which had no statutory basis for compensation of attorney fees. Rather, Plaintiffs asserted that the causes of action were inextricably intertwined and that it would be impracticable to attempt to apportion the fees related to Unruh and those related to the other claims for relief. Defendants opposed the motion, arguing in pertinent part, that Plaintiffs' counsel's block billing made it impossible to apportion fees and that the fee award should be reduced by the fees associated with Platinum's causes of action and by discovery sanctions that they previously paid.

In awarding attorney fees, the court allocated to Plaintiffs fees for almost all of their counsel's work on the case. The court reduced Plaintiffs' total claim for fees by the billing the court discerned to be associated with (1) the intentional infliction of emotional distress punitive damages phase of trial, (2) Plaintiff Platinum's claims, and (3) a discovery dispute, for which Defendants already paid sanctions. In explaining how it assessed these amounts, the court described its computations for each deduction.

---

[3]      Block billing refers to "billing for multiple tasks in a single entry." (*Charnay v. Cobert* (2006) 145 Cal.App.4th 170, 177, fn. 8.)

30

First, the court stated that it "deducted $41,893 from the total claim for fees associated with the punitive damages phase of the trial because such fees are not recoverable." (Boldface omitted.) Notably, this punitive damages phase of trial was solely attributable to Plaintiffs' punitive damages recovery for intentional infliction of emotional distress, and had nothing to do with recovery under Unruh. The $41,893 figure was derived by adding up all of Plaintiffs' counsel's billing entries associated with the second phase of trial.

Second, the court also explained that it "deducted $70,468 from the total claim based on its calculation of the portion of fees reasonably attributable to Platinum's claims which are also not recoverable." (Boldface omitted.) In determining the fees attributable to Platinum's claims, the court reasoned that "since Platinum's total recovery was approximately 3.2% of the total recovery of all the plaintiffs, it is reasonable to attribute that percentage of the time spent to work relating to Platinum's claims." The court calculated that $70,468 was 3.2% of the attorney fees claimed by Plaintiffs.

Lastly, the court stated that it "deducted $10,000 for the fees associated with a discovery dispute that were previously paid by Defendants as sanctions." (Boldface omitted.) The total deductions amounted to $122,371.

The court chose not to apportion fees associated with the individual Plaintiffs' tort causes of action from fees associated with their cause of action for Unruh. The court stated that it "carefully considered the complexity of the litigation, the fact that the plaintiffs' claims, as tried, were substantially interrelated and the defendants have not pointed out any rational way to segregate the fees attributable to non-Unruh Act claims as to the individual plaintiffs." The court awarded a total of $2,099,785.50 in attorney fees to Plaintiffs for their successful Unruh claims.

On appeal, Defendants assert that we should reverse the attorney fee award, contending that (1) the trial court failed to apportion out fees unrelated to the Unruh claims; (2) the trial court used an unreasonable method for deducting fees related to Plaintiff Platinum's claims; and (3) the trial court erred in not applying the lodestar method for calculating fees. We review the court's attorney fee award for an abuse of

31

discretion. (*Visher v. City of Malibu* (2005) 126 Cal.App.4th 364.) " '[T]he appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason.' " (*Dove Audio, Inc. v. Rosenfeld, Meyer & Susman* (1996) 47 Cal.App.4th 777, 785, quoting *Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478 [243 Cal.Rptr.902, 749 P.2d 339].) " 'The burden is on the party complaining to establish that discretion was clearly abused and a miscarriage of justice resulted.' [Citations.]" (*Maxim Crane Works, L.P. v. Tilbury Constructors* (2012) 208 Cal.App.4th 286, 297-298.)

When assessing attorney fees, the trial court "begins with a touchstone or lodestar figure, based on the 'careful compilation of the time spent and reasonable hourly compensation of each attorney . . . involved in the presentation of the case.' " (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1131-1132 (*Ketchum*) citing *Serrano v. Priest* (1977) 20 Cal.3d 25, 48.) The Supreme Court has explained that "the lodestar is the basic fee for comparable legal services in the community; it may be adjusted by the court based on factors including, as relevant herein, (1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, (4) the contingent nature of the fee award. [Citation.] The purpose of such adjustment is to fix a fee at the fair market value for the particular action." *(Ketchum,* at p. 1132.)

As the lodestar method for calculating attorney fees guides our analysis, we characterize Defendants' arguments regarding the attorney fees into two categories: challenges to the attorneys' reasonable hourly rates and challenges to the amount of time for which Plaintiffs' attorneys seek compensation. We address each set of arguments in turn, expending the bulk of our analysis on the court's calculation of compensable hours, which Defendants have focused on at trial and on appeal.

a.      *Plaintiffs' Hourly Fees Were Reasonable*

Defendants contend that the court erred in its attorney fees analysis because "[t]he order awarding fees contains no findings as to the reasonableness of the rates or the hours expended, nor does it indicate whether the court actually reviewed the individual time entries." Yet, the "trial court is not required 'to issue a statement of decision with regard

to the fee award,' or to provide detailed reasons for overruling objections to a fee request. [Citation.] . . . 'No specific findings reflecting the court's calculations [are] required. [Citation.] "The record need only show that the attorney fees were awarded according to the 'lodestar' or 'touchstone' approach." [Citation.] On appeal we infer all findings in favor of the prevailing parties.' [Citation.]" (*Lockaway Storage v. County of Alameda* (2013) 216 Cal.App.4th 161, 192-193.) In other words, "[i]n reviewing a challenged award of attorney fees and costs, we presume that the trial court considered all appropriate factors in selecting a multiplier and applying it to the lodestar figure. [Citation.]" (*Ramos v. Countrywide Home Loans, Inc.* (2000) 82 Cal.App.4th 615, 621.)

Here, Mr. James H. Turken, a partner at the firm representing Plaintiffs and the supervising attorney of the litigation at issue in this case, provided a declaration in support of the motion for attorney fees. In the declaration, he explained each attorney's role in the litigation, their level of experience, and their corresponding hourly rate. The rates varied from $200 per hour for the most junior associate to $675 per hour for the most senior attorney who had more than 30 years of experience. Mr. Turken attested that "[t]he hourly fees charged by [Plaintiffs' counsel's firm] are lower than or comparable to those by similar firms." He asserted that to the best of his knowledge, the fees Plaintiffs requested were "correct and were necessarily incurred in preparing for the trial in this action." Attached to and identified within Mr. Turken's declaration were over 140 pages of block billing entries, which set forth the work performed by Plaintiffs' attorneys prior to and during trial. The court relied on Mr. Turken's declaration and the billing records to make its determinations regarding time spent on Unruh aspects of the litigation and reasonable hourly rates. Defendants failed to submit credible evidence to contest the billing entries. Rather, they submitted handwritten notes on billing entries from an associate without providing her qualifications to perform such an analysis of billing entries.

With the standard of review in mind, we presume the court found Mr. Turken's explanation of the hourly rates credible and relied on Plaintiffs' evidence to determine the reasonable amount of attorney fees. This appears particularly true as the hourly rates were unaltered by the court and Defendant did not provide any evidence that such rates were unreasonable. Below, Defendants only argued that multiple attorneys billing for the same task made the fees unreasonable, that the tasks were not legal in nature, or that block billing made it difficult to discern what work was attributable to Unruh. As the reasonableness of the hourly rates went unchallenged below, we lack any evidence to support a conclusion that the court abused its discretion when it implicitly found that such fees were reasonable. (See *In re S.B.* (2004) 32 Cal.4th 1287, 1293 ["a reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court"], superseded on other grounds by Welf. & Inst. Code § 366.26, subd. (c)(4)(C).)

We thus affirm the court's analysis with regard to the reasonableness of Plaintiffs' counsel's hourly rates.

*b.        The Court's Determination that the Individual Plaintiffs' Causes of Action Were Inextricably Intertwined And Thus Not Practicable for Apportionment Was Proper*

Defendants state that, "Plaintiffs were not entitled to collect fees for the large portion of their counsel's work that was necessarily unrelated to the Unruh Act." Defendants argue that the court's failure to apportion fees between the individual Plaintiffs' tort causes of action was an abuse of discretion because "it is not true that all of the attorneys' time was spent on issues that are 'inextricably intertwined' with the Unruh Act." Defendants take issue with Plaintiffs' counsel using block billing, arguing that the court "declined to make a good faith attempt to apportion fees," instead awarding Plaintiffs substantially all of their requested fees.

It is well established that apportionment of attorney fees "is within the trial court's discretion." (*El Escorial Owners' Assn. v. DLC Plastering, Inc.* (2007) 154 Cal.App.4th 1337, 1365.) "Attorneys fees need not be apportioned between distinct causes of action where [a] plaintiff's various claims involve a common core of facts or are based on related legal theories." (*Drouin v. Fleetwood Enterprises* (1985) 163 Cal.App.3d 486, 493.) "Such fees need not be apportioned when incurred for representation on an issue common to both causes of action in which fees are proper and those in which they are not. [Citation.] Apportionment is not required when the claims for relief are so intertwined that it would be impracticable, if not impossible, to separate the attorney's time into compensable and noncompensable units. [Citations.]" (*Bell v. Vista Unified School Dist.* (2000) 82 Cal.App.4th 672, 687 (*Bell*).)

Contrary to Defendants' contentions, the trial court made a good faith attempt to apportion damages between the Unruh and tort claims, and did not abuse its discretion. The four causes of action asserted by the individual Plaintiffs are intertwined: all involve proof of the same core set of facts and development of the same set of evidence. Each cause of action is based on the theory that Defendants denied Plaintiffs access to hotel services because they were Jewish. Issues common to all causes of action were pervasive throughout the litigation, such that apportionment of fees was impracticable. Therefore the court's decision not to apportion damages with regard to the individual Plaintiffs' causes of action did not result in an abuse of discretion.

Defendants argue that they should not have to pay "extra fees because Plaintiffs' counsel chose to block bill." It is well established that "block billing is not objectionable 'per se,' " though it may "increase the risk that the trial court, in a reasonable exercise of its discretion, will discount a fee request." *(Jaramillo v. County of Orange* (2011) 200 Cal.App.4th 811, 830; see *Downey Cares v. Downey Community Development Com.* (1987) 196 Cal.App.3d 983, 997 ["Where a lawsuit consists of related claims, and the plaintiff has won substantial relief, a trial court has discretion to award all or substantially all of the plaintiff's fees even if the court did not adopt each contention raised."].) As explained above, the causes of action were so intertwined that it would be impracticable,

35

if not impossible, to separate the attorney's time into compensable and noncompensable units for the causes of action asserted by the individual Plaintiffs. Even if the billing entries were further broken down, the work would likely be attributable to Unruh causes of action based on the nature of Plaintiffs' claims and how they were presented at trial. "The 'experienced trial judge is the best judge of the value of professional services rendered in his court, and . . . his judgment . . . will not be disturbed unless the appellate court is convinced that it is clearly wrong.' [Citations.]" (*Serrano v. Priest, supra,* 20 Cal.3d at p. 49.) We conclude that the trial court properly exercised its discretion and judgment in relying on the block billing entries under the facts of this case.

Defendants also assert that the court impermissibly shifted the burden to Defendants to apportion fees related to Unruh and those related to the other causes of action. Yet, as the court pointed out, "Plaintiffs' fee claim is supported by detailed billing records covering the two plus years of time from the plaintiffs' first meeting with their law firm in August, 2010 up to and including post trial work on the fee application and costs bill in December, 2012. The Plaintiffs also submitted a declaration by the lead trial attorney, Mr. James Turken, supporting the billing rates utilized and the time spent in litigating this complex case." Based on the court's reliance on this evidence in rendering the fee award, it can be deduced that the court implicitly found that Plaintiffs met their burden to establish the fees that were permissible for them to recover based on credible evidence. The court noted that in opposition, Defendants "submitted an analysis of the billing made by an associate in their firm identifying . . . 'objectionable' fee entries. However, the Defendants presented no evidence of the competence of that individual to assess the appropriateness of the entries." Consistent with the court's findings, the record reveals that Defendants submitted an associate's declaration which failed to set forth her qualifications to establish that she was competent to assess the billing. This declaration was accompanied by copies of Plaintiffs' billing records covered in the associate's hand-written notes next to entries, stating "nonfee," "non-billable, non-legal, admin," "duplicative," "superfluous," and other words. Defendants failed to produce any competent evidence in support of their opposition. Defendants also

36

did not propose an alternative method for calculating the fees or present calculations regarding how to reduce the fees. The Court stated that Defendants simply argued that "the mere identification of the entries as 'objectionable block-billing entries,' requires the Court to reject them in *toto*." We conclude that the court did not impermissibly shift the burden to Defendants to apportion attorney fees. Rather, Plaintiffs met their burden in proving their fees and Defendants failed to produce any creditable evidence to the contrary.

Defendants' evidentiary shortcomings also impact Defendants' contention that the "trial court erred in awarding fees to Plaintiffs for noncompensable activities,[4] such as marketing and press work, and various inefficiencies and duplicative efforts." As explained in the preceding paragraph, Defendants' argument regarding allegedly improper billing entries is unsupported by competent evidence. When challenging attorney fees, "it is the burden of the challenging party to point to the specific items challenged, with a sufficient argument and citations to the evidence. General arguments that fees claimed are excessive, duplicative, or unrelated do not suffice." (*Premier Medical Management Systems, Inc. v. California Ins. Guarantee Assn.* (2008) 163 Cal.App.4th 550, 564.) " 'It is the burden of the party challenging the fee award on appeal to provide an adequate record to assess error.' " (*Ketchum v. Moses, supra,* 24 Cal.4th at pp. 1140–1141.) We will not engage in a factual analysis of these undeveloped issues on appeal.

---

[4]     We note that these alleged "noncompensable activities" can at times, warrant compensation. (See *Davis v. City and County of San Francisco* (9th Cir. 1992) 976 F.2d 1536, 1545 [public relations efforts that contribute "directly and substantially, to the attainment of [the plaintiffs'] litigation goals" may be compensable], rehg. denied, judg. vacated in part and cause remanded (9th Cir. 1993) 984 F.2d 345.)

Citing *Bell, supra,* 82 Cal.App.4th at p. 689, Defendants assert that when presented with block billing in a fee request, the court must assign "a reasonable percentage to entries or simply cast them aside." Defendants take this quotation out of context. In *Bell,* the Court held that where the plaintiff's counsel admitted that the majority of his block billing entries were spent on issues unrelated to that for which he could recover attorney fees, the court should have exercised its discretion to assign a reasonable percentage to the entries appropriate for recovery, or not award fees for those entries. (*Ibid*.) That is not the case here, where there is no evidence that any of the entries for the individual Plaintiffs' causes of action were attributable mostly or divisibly to issues unassociated with Unruh claims.

For the reasons stated above, we affirm the trial court's decision not to apportion fees for the individual Plaintiffs' causes of action and the court's exercise of discretion to rely on Plaintiffs' block billing evidence. To this extent, the court did not err in determining the attorney fee award.

c. *The Court Abused Its Discretion by Applying an Unreasonable Methodology for Deducting Fees Associated with Platinum's Claims*

Defendants assert that the "percentage of total recovery" proxy for assessing attorney fees was "an unreasonable and arbitrary method for deducting fees for work relating to Platinum." We agree that the court abused its discretion in utilizing the percentage of total recovery as a proxy for the amount of attorney fees to be apportioned for Platinum's claims. The court's reliance on the percentage of recovery attributable to Platinum's claims is particularly arbitrary, as under this theory, a defense attorney could effectively cause their client to pay more in attorneys' fees by successfully defeating causes of action that are separate and not intertwined with Unruh causes of action. This method of apportionment could effectively penalize Defendants for their successes in litigating Platinum's causes of action. The unreasonableness of the court's apportionment methodology becomes even more evident on appeal, when the percentage of recovery is subject to alteration: Plaintiffs' attorney fees award could fluctuate based on Defendants' success on appeal in obtaining reversal of damages awards. To prevent

38

duplicative recovery, we reversed the intentional infliction of emotional distress punitive damages award in this opinion. This ruling reduces Plaintiffs' total recovery by 24.5%. If we were to affirm this methodology, the trial court would have to recalculate apportionment of fees associated with Platinum based on the new total damages figure. This would effectively reduce Plaintiffs' attorney fees for entirely arbitrary reasons, as the evidence supporting the fees award has not changed. There has been no new showing that Plaintiffs' counsel worked any less on Unruh claims or any more on Platinum's contract based causes of action.

We thus conclude that this method of apportionment for Platinum's claims resulted in a miscarriage of justice.[5] We remand for the court to reapportion fees associated with Platinum's claims. On remand, the court must determine whether billing entries can be attributed solely to Platinum's claim. The time stated in such billing entries attributable solely or mostly to Platinum's claims must reduce the total time used to calculate the lodestar amount. In addition, the court "must examine the nature and 'course of conduct' upon which the claims are based." (*Harman v. City and County of*

---

[5]    To the extent that Defendants assert that the "percentage of total recovery" method of assessing fees should be applied to measure the fees incurred in pursuing punitive damages, this is no longer a viable argument. We have reversed the award of punitive damages to the individual Plaintiffs for intentional infliction of emotional distress, and those damages no longer compose any part of the total recovery. In addition, the "percentage of total recovery" method of assessing fees is unreasonable for the reasons stated above. Furthermore, Defendants misconstrue the principles of apportionment by attempting to apply that method in this context. Prior to trial and during the first phase of trial, which dealt with actual damages resulting from the discrimination, the emotional distress claims and the Unruh claims were inextricably intertwined. Under both claims, Plaintiffs sought to prove that Defendants discriminated against them by refusing to provide them services at the hotel because they were Jewish. The attorneys' work (occurring pretrial and during the first phase of trial) that went into proving the actual damages associated with the Unruh violation was also attributable to proving actual damages for emotional distress. Only in the second phase of trial, which dealt entirely with punitive damages for intentional infliction of emotional distress, could the court extricate the attorney fees associated with intentional infliction of emotional distress from those associated with Unruh claims. The court's apportionment was thus proper, as this phase of trial was unassociated with Unruh.

39

*San Francisco* (2007) 158 Cal.App.4th 407, 423.)  The court is to determine whether Platinum's causes of action are inextricably intertwined with the Unruh cause of action by reasoning whether claims involve a common core of facts or are based on related legal theories.  (*Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, 1251.)  If the issues in Platinum's claims and the Unruh claims are so inextricably intertwined that it would be impractical or impossible to separate the hours billed into compensable and noncompensable units, then the court need not attempt to apportion the hours and may award fees for all of the hours.  (See *Ibid*.)  If the claims are not inextricably intertwined, the court must exercise its discretion to assign a reasonable percentage of the block billing to fees associated with Platinum's claims by relying on the billing evidence provided by Plaintiffs and the court's own assessment of the work expended by Plaintiffs' counsel on the different claims based on its pretrial and trial experience working with the parties.

In conclusion, we remand the attorney fees award to the trial court to determine the appropriate amount of attorney fees by applying a reasonable method to apportion fees associated with Platinum's claims.  We affirm the court with regard to all other issues raised by Defendants as to attorney fees award.

7. *Defendants' Remaining Issues on Appeal Are Moot*

The remaining issues raised by Defendants are related to the causes of action for intentional and negligent infliction of emotional distress, and negligence.  Specifically, Defendants argue that:  Plaintiffs failed to prove unlawful intent to support a claim for intentional infliction of emotional distress, Defendants owed no duty to Plaintiffs sufficient to support a claim for negligence or negligent infliction of emotional distress, and the jury provided inconsistent and irreconcilable verdicts by rendering verdicts in favor of eleven Plaintiffs for both negligent and intentional infliction of emotional distress.

We decline to address these arguments because " '[w]here the verdict of the jury and the judgment based thereon may be sustained on any reasonable theory, it will not be disturbed by an appellate court.' [Citation.]." (*Nelson v. Painless Parker* (1930) 104 Cal.App. 770, 774; see *Cahill v. San Diego Gas & Electric Co*. (2011) 194 Cal.App.4th 939, 956 ["[I]f a judgment is correct on any theory, the appellate court will affirm it regardless of the trial court's reasoning. [Citations.] All intendments and presumptions are made to support the judgment on matters as to which the record is silent."].) Here, the verdict for actual damages and statutory penalties is affirmable under the Unruh cause of action, which the jury decided in favor of each of the individual Plaintiffs. Because we reverse the award of punitive damages, we need not address the intentional infliction of emotional distress claim.

In sum, to the extent we affirm the jury's verdict, we do so by relying on Plaintiffs' Unruh violation theory of recovery. We decline to address Plaintiffs' arguments regarding negligence, negligent infliction of emotional distress, and intentional infliction of emotional distress claims as they are not decisive to any aspect of our holding.

## DISPOSITION

The punitive damages award is reversed. The attorneys fees award is reversed with respect to the amount of fees awarded, and remanded for determination of fees consistent with this opinion. The judgment is affirmed in all other respects. Plaintiffs Platinum Events, LLC, Scott A. Paletz, Stephen C. Fowler, Ari Ryan, Yanitz Rubin, Marc Newburger, Nick Morrison, Laura Morrison, Matthew Clifford, Jason Shuman, Alex Litvak, Karen Springer, Laura Lugash, Jordan Freedman, Scott Gold, James Whipple, Matt Florin, Ariana Nussdorf, and Lyubomir Sokolovskiy are awarded their own costs on appeal.

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

KITCHING, J.

I concur:


KLEIN, P. J.


EDMON, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.